Steven M. Cox, Esq.
PCC #11552  SB # 005094
smcox@waterfallattorneys.com

LAW OFFICES
WATERFALL, ECONOMIDIS, CALDWELL,
HANSHAW & VILLAMANA, P.C.
Williams Center, Eighth Floor
5210 E. Williams Circle
Tucson, AZ 85711
(520)790-5828

Attorneys for Metric Roofing, Inc.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | NO. 4:15-bk-14945-BMW |
| SETH MICHAEL WINTERS and GENEVIEVE ALYCE WINTERS, | Adversary No. 4:16-ap-00108-BMW |
| Debtors. | (Chapter 13) |
| METRIC ROOFING, INC., | **RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Plaintiff, | |
| vs. | **and** |
| SETH MICHAEL WINTERS and GENEVIEVE ALYCE WINTERS, Debtors; and DIANNE C. KERNS, as Chapter 13 Trustee, | **PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| Respondents. | |

Metric Roofing, Inc. ("Plaintiff" or "Metric") hereby submits its *Response To Defendants' Motion For Partial Summary Judgment* and *Cross-Motion For Summary Judgment*. There is no genuine dispute of material fact in this adversary proceeding, Defendants are simply not entitled to any discharge of the debt they owe to Plaintiff, which has already been tried to a jury and the appeal filed subsequently has been withdrawn. This Response and Cross-Motion is supported by *Plaintiff's Response to Defendants' Separate Statement of Facts in Support of the Defendants' Motion for Partial Summary Judgment* and *Plaintiff's Separate Statement of Facts in Support of Plaintiff's Cross-Motion for Summary Judgment*, the record herein, and the following Memorandum of Points and Authorities,

all incorporated herein by this reference. Plaintiff respectfully requests that this Court deny the Defendants' Motion For Partial Summary Judgment and grant the Plaintiff's Motion For Summary Judgment, based on the record of undisputed, material facts.

MEMORANDUM OF POINTS AND AUTHORITIES

I. Introduction

Defendants claim that the result at trial was the result of some "mistakes" on their part, but assert the jury ran amok in finding for Plaintiff on all claims and awarding substantial damages. The simple truth of this adversary proceeding is that the debt at issue arises out of a core plan executed by Defendant Seth Winters ("Winters") and Jason Brown ("Brown") to first malign Metric, then steal Metric's customers while funding the start-up of their competing company with materials and equipment embezzled from Metric. With fraudulent intent, Winters and Brown - then the two key employees in Metric's Tucson office - defamed Metric, took advantage of Metric's trust, embezzled and stole property from Metric, and unlawfully competed with Metric. Indeed, a jury has already found that Winters and Brown took deliberate, intentional action that caused significant injury to Metric, and returned a verdict in favor of Plaintiff and against Defendant Seth Winters, on all counts, and in the total amount of five hundred, thirty-eight thousand and fifty-two dollars and sixteen cents ($538,052.16). Specifically, the jury awarded damages to Plaintiff as follows:

$70,000.00 in compensatory damages resulting from the Defendants' Breach of Fiduciary Duty;

$26,250.00 in compensatory damages resulting from the Defendants' Tortious Interference With Business Relations;

$70,000.00 in compensatory damages resulting from the Defendants' Unfair Competition;

$8,750.00 in compensatory damages resulting from the Defendants' Defamation;

$6,250.00 in compensatory damages resulting from the Defendants' Conversion; and

$350,000.00 in punitive damages.

That is, the jury believed that the conduct of the Defendants was intentional and so reprehensible

-2-

and malicious that a substantial award of punitive damages was made in favor of Metric in such amount.

Based on the record of undisputed, material facts, the debt owed by Defendants to Plaintiff is nondischargeable, under 11 U.S.C. § 523(a)(4) and (6).

II. Factual Background

A. *Executive Summary of Background Facts.*

This matter involves a scheme by Winters and Brown - who in early 2013 were the two managerial employees for Metric's operations in Southern Arizona - to defame and harm the reputation of Metric using their unique access to Metric's files and their insider information, and to steal major customers from Metric while they were still employed by and drawing a paycheck from Metric. The thefts, however, did not stop at information, and instead Winters and Brown funded their new startup competing roof company by also stealing significant quantities of materials and equipment from Metric; and according to witness testimony, they even used Metric work crews being paid by Metric for their own new company's work.

To further the scheme, Winters tendered his resignation from Metric after having already conspired to take Metric's major customer, stating that he would not be a competitor, and instead planned on remodeling homes in Mesa. Given the specific representation that he was not leaving to compete, he was asked to stay on at Metric for a few weeks, where he continued to have access to Metric's contracts and bids; the same bids to customers that Winters was actively preparing on behalf of his new company and the same contracts that Winters was proposing to undercut.

Brown stayed at Metric for a few months, and was essentially a mole inside Metric that was actually working for his and Winters' competing company, allowing further theft of materials, files, customers, and proprietary information in breach of numerous fiduciary and other duties to Metric. This conspiracy, in fact, worked as planned since Metric lost its largest customer - D.R. Horton - who cancelled all its numerous contracts with Metric and placed all such contracts, including some new ones

-3-

that Metric had also bid on, with Winters' and Brown's company resulting in a seven figure loss to Metric. Following a jury trial, the jury found in favor of Metric on each of the claims asserted, awarding compensatory damages against Winters and Brown in the amounts of $181,500 each and, given their intentional malicious conduct, awarded punitive damages against Winters of $350,000 and against Brown in the amount of $150,000. Both Winters and Brown subsequently filed these bankruptcies, and Metric has sought to have the judgments against both declared non-dischargeable.

B.  *Detailed Factual Background.*

Winters was an employee of Metric from January 17, 2011 until February 28, 2013. At the time of his resignation, which was tendered a few weeks prior, Winters was employed as a Manager of Metric's operations in Southern Arizona. In the scope of Winters' employment with Metric, Winters was the primary contact for customers, regularly utilized Metric's computer system including the restricted access files for inventory and shipping orders on specific jobs, and had access to electronically stored documents including customer information, bids, and contracts. Winters also had access to some of Metric's Master Job Files, which included contracts, plans and pricing information.

In early February 2013, Winters gave notice to Metric of his resignation and Winters represented that he would be starting his own general contracting business doing repair work in the Mesa/Phoenix area, which role would not have competed with Metric's business. However, while still employed with Metric as a Manager of Metric's Southern Arizona operations, Winters had already formulated and implemented a plan with Brown to form a separate roofing contracting business, Invierno Design, LLC ("Invierno") that would not only compete with Metric and provide the same services to existing Metric customers, but actually sought to destroy Metric's reputation with key customers and steal the contracts and resulting financial benefits. No mention was made of Brown's involvement in Invierno, but instead Brown remained employed by Metric as the General Superintendent for Metric's Southern Arizona operations.

In 2013, Winters, Brown, and Christopher Breen ("Breen") built a small office shed located at

-4-

Breen's residence using some materials taken from Metric's supply yard, and outfitted with office equipment also largely taken from Metric. It was from this shed that they managed the operations of Invierno for about a year. Winters and Brown stole materials, office furniture, and office supplies from Metric for use in the Invierno office shed and that, according to Breen, Brown said, "no one would know it was missing or it was gone." Winters and Brown stole silicone, sealants, equipment for caulking guns, heat guns, screw and/or nail guns, and other equipment from Metric for use on Invierno projects. They also stole roofing harnesses from Metric and then later changed the brand of roofing harnesses used on Invierno projects because they did not want to get caught using the stolen, Metric roofing harnesses. Winters and Brown stole boxes - totaling hundreds of tubes - of caulking materials from Metric for use on Invierno projects. They also stole an expensive roofing product called "peel and stick" from Metric and after Metric filed a lawsuit, Winters and Brown switched the brand of peel and stick they used on Invierno projects hoping - incorrectly as it would turn out - that it could not be proven that Winters and Brown were stealing this material from Metric and using it on Invierno roofs. Winters, Brown, and Invierno were "flat broke" when they started, and their theft of materials and equipment from Metric for use in Invierno was critical to their start up. In short, they stole from Metric to be able to start-up Invierno.

Winters and Brown also badmouthed Metric to builders and other Metric customers telling them that Metric was going out of business. Specifically, Winters and Brown, while they were still employed at Metric, told Daryl Fulton ("Fulton"), the purchasing manager and primary person at D.R. Horton responsible for picking subcontractors, that Metric would be shutting down or closing its doors, but that they would be able to service D.R. Horton with their new company. Specifically, while they were still employees of Metric, Winters and Brown had discussions with Fulton about starting their own company that would compete with Metric and work on D.R. Horton projects instead of Metric. They also made several comments to Fulton that Metric didn't have respect for Fulton and/or D.R. Horton because of Fulton's homosexuality. These comments were false, but Fulton did know that and they naturally made

Fulton very upset and contributed to D.R. Horton terminating Metric and giving all the work to Invierno.

Winters and Brown also improperly took and/or spent Metric assets by using their Metric credit card to purchase gas and meals for non-Metric purposes. On several occasions, Winters and Brown filled up Winters' gas tanks with a Metric Credit Card after Winters had left employment with Metric and also the gas tanks of Breen, who was never a Metric employee, but was then actively working with Winters and Brown and against Metric. Winters, on multiple occasions, purchased items at Home Depot and Lowe's with a Metric credit card and then would return the items in exchange for a gift card which Winters could use for his own purposes or for Invierno. Perhaps most insultingly and improperly, Winters and Brown used their Metric credit card to pay for entertainment expenses and meals with Metric customers to badmouth Metric and sell these customers on switching to Invierno.

After the Complaint was filed in Pima County Superior Court case number CV2013-1929, Winters got rid of some "very bad papers" that "were pretty incriminating" by having a small fire in a dumpster on Breen's property. According to Breen, Invierno could not have the files around and they had to "get rid of these things." We do not now know what these incriminating papers were because Winters and Brown destroyed them to cover their own malicious tracks, but they were quite clearly documents that further proved the intentional bad actions that Winters and Brown took to embezzle and steal from Metric.

C.   *The Jury Verdict.*

Plaintiff's Complaint in Superior Court alleged five claims against Winters and Brown: 1) Breach of Fiduciary Duty; 2) Tortious/Intentional Interference with Business Relations; 3) Unfair Competition; 4) Defamation; and 5) Conversion. Following a four day trial, a jury found for Plaintiff and against Winters and Brown on all five counts. Additionally, Judge Woods denied a motion for directed verdict on the punitive damages claim, finding that Metric had made a prima facie showing sufficient to meet the high standard in Arizona of showing, by clear and convincing evidence, that the

Case 4:16-ap-00108-SHG   Doc 21   Filed 08/05/16   Entered 08/05/16 14:58:59   Desc
Main Document    Page 6 of 14

actions taken by Winters and Brown were willful and malicious. The jury agreed that Metric had proven the claim that Winters and Brown acted with intentional malice and awarded substantial punitive damages against Winters and Brown, with a higher amount attributable to Winters who appeared to a greater extent to be the "ringleader" of the wrongdoing.

That is, Metric has already proved its claims to a jury of Winters and Brown's peers, that they not only acted in a manner that made them liable for intentional bad acts, but did so with the requisite intent to cause "willful and malicious injury" necessary to support imposition of punitive damages.

D.  *The Abandoned Appeal.*

Winters' Motion for Partial Summary Judgment asserts that the Verdict is being appealed. Actually, the appeal was dismissed as a result of a Motion to Dismiss filed by Winters and Brown of their own appeal on April 20, 2016, well over a month prior to the filing of the present motion. Indeed, the Mandate issued on June 1, 2016, meaning any appeal was actually abandoned and no longer existed prior to the filing of present motion. The result is this: the Verdict and Judgment stand and are final, they are not subject to any further appeal or modification, and they represent *res judicata* of the issues, and/or collateral estoppel.

III.  Law And Argument

A.  *Introduction.*

The gist of Winters' argument is that the "fresh start" policy ought somehow to operate to excuse the significant injury caused by the numerous intentional and wrongful torts Winters was found by a jury to have committed, which the jury found, by awarding substantial punitive damages against Winters under the high standard for such an award in Arizona, were willful and malicious. However, as the United States Supreme Court has made clear, the "fresh start" policy, "limits the opportunity for a completely unencumbered new beginning to the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)). Winters simply does not fit into the category of being honest but unfortunate and, as such, the debts incurred are not

-7-

dischargeable.

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny," and section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Here, Winters most certainly committed fraud and defalcation while acting in a fiduciary capacity, but more to the point, those acts and the Verdict establishes that he committed embezzlement and larceny and that the injury caused to Metric was willful and malicious. Indeed, the punitive damages award made by a jury establishes that Winters has been found to have intentionally caused the injury and, in and of itself, makes the debt of Metric against Winters non-dischargeable.

The jury was presented with evidence that, while still employed with Metric as a Manager of Metric's Southern Arizona operations, Winters formulated and implemented a plan to form Invierno to compete with Metric, convince Metric customers that Metric was going out of business, take those customers for his own benefit, and in the process he stole files, equipment, and materials that allowed him to fund the start up of Invierno. Actually, the jury heard that Winters stole money too, in that he sold a surplus Metric truck (which he was permitted to do) and pocketed some of the proceeds (which he was not permitted to do). These actions by Winters were clearly done with fraudulent intent.

B. *Metric Is Entitled To Summary Judgment For Its Claim Under 523(a)(6) Because The Punitive Damage Award Is A Finding Of "Willful and Malicious Injury."*

Winters claims here - substantial punitive damage award notwithstanding - that the jury somehow did not already consider whether the damages for which he was held personally liable are the result of a "willful and malicious injury" inflicted upon Metric. This is simply not the case. The jury awarded punitive damages, which under Arizona law may only be awarded if the jury did, in fact, find that the injury was the result of willful and malicious injury. Accordingly, as there is now finality of the Verdict with no further chance of appeal, the issue is now *res judicata* and Metric is entitled to summary judgment against Debtors.

-8-

The 9th Circuit has held that "both compensatory and punitive damages are subject to findings of nondischargeability pursuant to section[ ] 523(a)(6)...." *In re Britton,* 950 F.2d 602, 606 (9th Cir. 1991) (citing *Moraes v. Adams* (*In re Adams*), 761 F.2d 1422, 1423(9th Cir.1985)). 'The exception is measured by the nature of the act, i.e., whether it was one which caused willful and malicious injuries. All liabilities resulting therefrom are nondischargeable.' " *Id.* (quoting *Coen v. Zick*, 458 F.2d 326, 329-30 (9th Cir.1972)). In this regard, the jury's finding of punitive damages under Arizona law is dispositive of the issue that there has already been a finding that Winters' actions met the standard provided for in section 523(a)(6) that excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

The jury instruction given by the Pima County Superior Court instructed the jury that, with regard to punitive damages, "Metric has the burden of proving by clear and convincing evidence, either direct or circumstantial, that a Defendant acted intentionally and with an evil mind." This is the same standard required pursuant to section 523(a)(6) for the debt to be non-dischargeable as exactly equates with a "willful and malicious injury" inflicted by Winters upon Metric. "Willful," in this context, means "deliberate or intentional." *In re Britton*, 950 F.2d 602, 605 (9th Cir. 1991) (citations omitted). Thus, pursuant to section 523(a)(6), the creditor must show the debtor acted intentionally. The intent required is intent to do the act at issue, not intent to injure the victim. *Id.* (citing *C.I.T. Fin. Serv., Inc. v. Posta* (*In re Posta*), 866 F.2d 364, 367 (10th Cir.1989) ("The 'willful' element is straightforward. It simply addresses whether the debtor intentionally performed the basic act complained of.")). "A 'malicious' injury involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.' " *Petralia v. Jercich* (*In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir.2001)); *In re Barboza*, 545 F.3d 702, 706 (9th Cir. 2008). To prove malice, the creditor must show the debtor's actual knowledge or the reasonable foreseeability that his conduct will result in injury to the creditor. *In re Britton*, 950 F.2d 602, 605 (9th Cir. 1991) (citations omitted).

Here, Winters and Brown were found by the jury to have caused willful and malicious injury to

-9-

Plaintiff. By executing their plan to defame, defraud, steal from, embezzle from, and otherwise take Metric's business for their own benefit, Winters and Brown committed wrongful and intentional acts, without any justification, that caused Metric significant injury. The jury was instructed that punitive damages could only be awarded under Arizona law if the jury found, by clear and convincing evidence, that Winters "acted intentionally and with an evil mind." And the jury followed that instruction, found the requisite intentional acts by Winters (e.g. "willful") were the result of an evil mind (e.g. "malice") and awarded $350,000 in punitive damages.

That is, there has already been a determination, on the merits, that Winters' debt to Metric arises as a result of "willful and malicious injury by the debtor to another entity or to the property of another entity" and Winters is now collaterally estopped from re-litigating this issue. *See In re Miera,* 926 F.2d 741 (8th Cir. 1991) (applying collateral estoppel where state court claim already determined question of whether action was "willful and malicious" in awarding punitive damages).[1] Because Winters is collaterally estopped from relitigating the final judgment imposing punitive damages, summary judgment is appropriate in favor of Metric declaring the entire debt non-dischargeable pursuant to section 523(a)(6).

C. *Embezzlement and Larceny Were Pled, Proven, and Found in the Verdict.*

Even if the entire debt owed by Winters were not made non-dischargeable pursuant to section 523(a)(6), and Metric were not entitled to summary judgment on this ground as Winters is collaterally estopped from re-litigating jury's findings in this regard, the debt would be nondischargeable pursuant

---

[1] Collateral estoppel bars relitigation when "(1) the issue decided in the prior action is identical to the issue presented in the second action; (2) there was a final judgment on the merits; and (3) the party against whom estoppel is asserted was a party... to the prior adjudication." *In re Bugna,* 33 F.3d 1054, 1057 (9th Cir. 1994)(citing *Garrett v. City and County of San Francisco*, 818 F.2d 1515, 1520 (9th Cir.1987). Here, as outlined above, the standard for finding punitive damages under Arizona law is identical to the standard under section 523(a)(6), there was final judgment which is now not subject to appeal, and that judgment and finding were specifically against Winters. Accordingly, collateral estoppel applies and Metric is entitled to summary judgment with regard to the issue of non-dischargeability of the entire debt of Winters pursuant to 523(a)(6).

-10-

to section 523(a)(4) because the claims all arise from Winters' embezzlement and larceny.

There is, of course, no requirement that the allegations of a complaint filed in state court prior to a debtor filing a bankruptcy petition correspond to the elements of the grounds contained in §523(a) of the Bankruptcy Code. *Banks v. Gill Distribution Centers, Inc.*, 263 F.3d 862, 868 (9th Cir. 2001) (explaining that plaintiffs are not required to anticipate that any defendant may declare bankruptcy and engage in needless litigation on every conceivable issue under § 523(a) in the event a defendant should subsequently file bankruptcy.) (citing *In re Moran*, 152 B.R. 493, 496 (Bankr. S.D. Ohio 1993). While Plaintiff was not required to plead, by specific name, embezzlement or larceny, these claims were asserted, were proven, and were found in the Verdict.

Paragraphs 56 through 60 of Metric's Complaint were entitled "Theft of Materials and Labor" and Count Six of the Complaint alleged intentional conversion. But it would be well after filing of the Complaint that Metric came to realize the full scope of Winters' activities in his regard. In the Joint Pretrial Statement, however, Metric clearly identified that it was alleging, and would seek to present evidence to the jury, that "supplies and office materials were taken by Winters and Brown" and that "these actions of taking or appropriating Metric's property constitute conversion." The Joint Pretrial Statement also identified embezzlement in the form of "several, significant, improper payments with a Metric credit card in their last few months of employment with Metric to benefit themselves" and identified the theft of "[a] significant amount of expensive roofing materials and/or supplies" and "several master job files, or hard copy paper files for certain construction projects."

Moreover, the entire gist of Metric's breach of fiduciary duty and unfair competition claims was that Winters and Brown willfully and maliciously stole from Metric to fund the startup of Invierno, to include the theft of equipment and materials, but also sought, through fraudulent means, to steal Metric's valuable contracts with its customers. At trial, consistent with Metric's allegations, the jury was presented with significant evidence of Winters' embezzlement and larceny of a number of items, to include Metric's most valuable asset, its numerous contracts with builder D.R. Horton.

-11-

Embezzlement is defined, for purposes of §523(a)(4), as "the fraudulent appropriation of property by a person to whom such property has been [e]ntrusted or into whose hands it has lawfully come." *In re Wada*, 210 B.R. 572, 576 (9th Cir.BAP1997)(quoting *Moore v. United States*, 160 U.S. 268, 269 (1895)) (alteration in original). Proof of the following elements is required: (1) property rightfully in the possession of a nonowner, (2) a nonowner's appropriation of the property to a use other than which it was entrusted, and (3) circumstances indicating fraud. *In re Ehrle*, 189 B.R. 771, 775 (B.A.P. 9th Cir. 1995) (citing *In re Littleton*, 942 F.2d 551, 555 (9th Cir.1991)). "Circumstances indicating fraud" can be situations where the debtor intended to conceal the misappropriation. *In re Campbell*, 490 B.R. 390, 402 (Bankr. D. Ariz. 2013) (citing *In re Hatch*, 465 B.R. 479 (Bankr.W.D.Mich.2012). Fraudulent intent may be shown by circumstantial evidence. *In re Fox*, 370 B.R. 104, 116 (6th Cir.BAP2007). "Fraudulent intent ... may be inferred from the totality of the circumstances and the conduct of the person accused." *Ormsby v. First Am. Title Co.,* 591 F.3d 1199, 1206 (9th Cir.2010); See also *Khalil v. Dev. Sur. & Indem. Co. (In re Khalil)*, 578 F.3d 1167 (9th Cir.2009) (In a §523 action, "intent may properly be inferred from the totality of the circumstances and the conduct of the person accused")

For purposes of §523(a)(4), larceny is a "'felonious taking of another's personal property with intent to convert it or deprive the owner of the same.'" *In re Ormsby*, 591 F.3d 1199, 1205 (9th Cir.2010), quoting 4 Collier on Bankruptcy ¶ 523.10[2] (15th ed.2008). "Felonious" for purposes of §523(a)(4) is defined as "wrongful; ... without excuse [or] color of right." Id. (citations omitted). Simply put, for purposes of §523(a)(4), larceny occurs when the debtor first comes into unlawful possession of the property of another. *Werner v. Hoffman*, 5 F.3d 1170, 1172 (8th Cir.1993); *Kaye v. Rose* (In re Rose), 934 F.2d 901, 904 (7th Cir.1991).

Here, Winters stole significant equipment and embezzled funds - to include improper credit card charges - from Metric. Indeed, the jury heard that for several months after Invierno began operations, it was using significant quantities of materials that were stolen from Metric by Winters and Brown.

-12-

1 Winters would also have Brown use the Metric credit card to fill up his gas tank when Winters no longer
2 worked for Metric and would do the same for others. But even more than that, Winters was entrusted
3 with overseeing the most valuable property that Metric had, its contractual relationship with Metric's
4 customers, which was embezzled by Winters just the same as the equipment and materials.

5       Specifically, the jury heard eyewitness testimony that Winters stole significant equipment that
6 Invierno used in its roofing, without which Winters could not have operated Invierno because "pulling
7 all the equipment over and extra materials and stuff like that, they [Winters and Brown] were flat broke
8 going into this thing ... So most of that got funded off the back of Metric in materials and the start up,
9 taking the work from Metric." That is, the entire operation of Invierno was funded as a result of
10 embezzlement and larceny from Metric, and a jury has already made the findings that Winters stole from
11 Metric with fraudulent and felonious intent, both as part of the conversion claim and the unfair
12 competition, which is why the jury awarded $350,000 in punitive damages in addition to the already
13 substantial compensatory award.

14       Based upon the jury's finding that Winters not only stole and embezzled from Metric, but that
15 Winters' actions merited a substantial punitive damages award, the question of whether Winters' debt
16 is non-dischargeable because, pursuant to Section 523(a)(4), Winters committed embezzlement and
17 larceny, is already answered. The jury found, and the verdict reflects, that Winters is liable for
18 conversion and unfair competition and the jury found that such actions were intentionally willful and
19 malicious such that substantial punitive damages were found against Winters. Therefore, the damages
20 assessed by the jury for unfair competition, tortious interference, and conversion, totaling $172,500 are
21 non-dischargeable. And as the jury has already found as such in the Verdict, and the resulting judgment
22 is no longer subject to any appeal, this matter is *res judicata* and/or collateral estoppel, and Metric is
23 entitled to summary judgment declaring the amounts non-discharge able.

24
25 ...

-13-

III. Conclusion

For all of the foregoing reasons, Plaintiff respectfully requests that this Court deny the Defendants' Motion For Partial Summary Judgment and grant the Plaintiff's Cross-Motion for Summary Judgment declaring the entire debt in the sum of $523,052.16, which is the result of the judgment entered on October 23, 2015, in Pima County Superior Court Case No. C2013-1929, nondischargeable pursuant to section 523(a)(6). In the alternative, Metric is at least entitled to summary judgment on the punitive damage claim in the amount of $350,000, which is undisputedly barred from relitigation by collateral estoppel and unequivocally found Winters caused "willful and malicious injury." In the further alternative, to the extent a redundant basis for nondischargabitliy is necessary - and it would seem its not - Metric is also entitled to summary judgment because the claims that resulted in the judgment of the Superior Court all arise from the fraudulent conduct of Winters and Brown amounting to embezzlement and larceny pursuant to §523(a)(4).

DATED this 5th day of August, 2016.

WATERFALL, ECONOMIDIS, CALDWELL,
HANSHAW & VILLAMANA, P.C.

By */s/ Steven M. Cox*
   Steven M. Cox
   Corey B. Larson
   Attorneys for Metric Roofing, Inc.

Filed this 5th day of August, 2016, a copy mailed or emailed to:

Seth Michael Winters
Genevieve Alyce Winters
3430 W. Sunshine Butte Dr.
San Tan Valley, AZ 85142
Debtors

Eric Slocum Sparks
Eric Slocum Sparks PC
110 S Church Ave #2270
Tucson, AZ 85701
Attorneys for Debtor
eric@ericslocumsparkspc.com
Attorneys for Debtors Brown

Kenneth L. Neeley
Christopher J. Dutkiewicz
Neeley Law Firm, PLC
2250 E. Germann Rd., Suite 11
Chandler, AZ 85286
ECF@neeleylaw.com
Attorneys for Debtors/Defendants Winters

By: */s/ L. Collins*

-14-

WATERFALL, ECONOMIDIS, CALDWELL, HANSHAW & VILLAMANA, P.C.
5210 E. Williams Circle, Suite 800
Tucson, AZ 85711
(520)790-5828